MOORE *v.* McCOY.

CANCELLATION OF INSTRUMENTS—DEEDS—MENTAL INCOMPETENCY—
UNDUE INFLUENCE—DISPUTED SIGNATURES.

In a suit to set aside a deed on the grounds of mental in-
competency, undue influence, and that said deed was not
signed by the grantor, evidence examined and *held*, that
the allegations of the bill are not sustained by a pre-
ponderance of the evidence.[1]

Appeal from Cass; Des Voignes (L. Burget), J.
Submitted October 17, 1924. (Docket No. 115.) De-
cided June 18, 1925. Rehearing denied October 1, 1925.

Bill by Ellura B. Moore against John W. McCoy to
set aside a deed. From a decree dismissing the bill,
plaintiff appeals. Affirmed.

*Walter C. Jones* and *Thomas J. Cavanaugh*, for
plaintiff.

*U. S. Eby* and *James H. Kinnane*, for defendant.

STEERE, J.   Plaintiff filed this bill in the circuit court
of Cass county, in chancery, to set aside a deed, dated
November 20, 1922, purporting to have been given by
her father, William H. McCoy, to her brother, John W.
McCoy, defendant herein, and recorded in the office of
the register of deeds of Cass county on November 22,
1922.   On its face it is a properly executed deed,
signed by said William H. McCoy, duly witnessed and
acknowledged, conveying to defendant an 80-acre farm
in Pokagon township, Cass county.   As originally
alleged in plaintiff's bill, filed December 2, 1922, the
grounds of invalidity charged against said deed were

[1]Cancellation of Instruments, 9 C. J. § 195.

mental incompetency and undue influence.   Defendant pleaded issuably, by answer filed December 20, 1922, in denial of those allegations.   The suit was brought to hearing on October 2, 1923.   Testimony was heard in open court upon those issues during that day and the following until both parties had rested, when counsel for plaintiff moved the court for an adjournment or continuance of the hearing for a week or so owing to a situation having developed rendering it necessary for plaintiff's side to make further preparation, or investigation.   This motion was objected to by the defense and the court having stated in substance that it could not be granted against objection without proper reason shown, plaintiff's counsel said:   "It is our claim that this signature on this deed is not the signature of Mr. McCoy, that he never signed his name to the deed."   After some further discussion the court continued the hearing until October 11, 1923.   On that date hearing was resumed and plaintiff's counsel was permitted to amend her bill by alleging "the deeds were never signed by decedent, William McCoy," to which defendant's answer was amended in denial.   Further proofs by the parties were heard on that issue and the case argued and submitted.   The court took the same under advisement and on December 11, 1923, filed an opinion reviewing the testimony at large and holding plaintiff had failed to establish any one of her three alleged grounds of invalidity by a preponderance of evidence, and on December 28, 1923, filed a decree dismissing her bill with costs, from which she duly appealed.

While taken as a whole this record makes clear that deceased departed this life not long after the date of the deed in question, the date of his death and his exact age at that time must, like the intent of a testator, be drawn from the four corners of the instruments

and record.    Turning to plaintiff's bill for that information we find it alleged in paragraph 2 that "said William H. McCoy, at the time of his death which occurred on or about the 23d day of November, 1923, was of the age of 95 years, feeble in mind and body," etc.    Defendant's answer in traversing said paragraph 2 of the bill says he "admits the date of the death of his said father, but denies his father was 95 years of age at his death, but says he was 93 years of age at his death."    No direct evidence was produced as to the date of his birth and we do not discover that any one of the over 30 witnesses sworn directly testified as to the day, month and year of his death, but Mr. Sever, an old gentleman who testified he had known deceased 60 or 70 years, said "he was something over 90 years old," in the summer of 1922 he noticed he seemed to be failing and he died that fall. Others testify in detail of his last illness of short duration and death from pneumonia, on or about November 23d, without stating the year, and that he executed the deed in question, with two others, but three or four days before his death.    Plaintiff, who alleged in her bill that her father's age was 95 years when he died on November 23, 1923, testified that she was 49 years old and as near as she could "figure" her father was 96 or 97 years old when he died. The trial court stated that deceased "died at the ripe age of about 95 years."

Deceased is shown to have been one of the pioneers of Cass county, settling there, according to tradition, when he was a child.    His calling was that of a farmer and he had spent most of his life in Pokagon township, much of it on his 80-acre home farm, described in the deed to his son John in controversy here.    He was twice married, his last wife's death preceding his by about 15 years.    During his long life he had made three wills, the last after the death

of his second wife.    He left surviving him three children, plaintiff, Ellura B. Moore, defendant, John W. McCoy, and his youngest daughter, Edna Gwilt, all of mature years and married, Edna the youngest having a family of eight children.    His early educational advantages were limited.    He is described as an industrious farmer of frugal habits, rather strong will and not easily influenced.    The physician who attended him in his last sickness and had known him for 10 years, described him as having "considerable will power," with a "strong, robust and vigorous constitution for a man of his age."    It was shown that up to the time of his last brief illness he cared for himself, managed his farm and business affairs, looked after repairs, attending to ordinary and usual business matters which customarily arise in the life of a farmer.    His relations with all his children were always congenial so far as shown until some time before his death plaintiff unsuccessfully instituted proceedings in the probate court to have him adjudicated mentally incompetent and a guardian appointed to manage his affairs.    Although she failed in that endeavor he was much grieved by her conduct towards him in his old age, occasionally commenting on it to others and even spoke of it to the nurse who attended him in his last illness.    The testimony of apparently responsible and disinterested witnesses who did business with him in the last years of his life and of those who saw him before and at the time of his death is overwhelming to the effect that though he had grown old and his physical powers abated he retained his independence of thought, memory and mental vigor to the last.    Mr. Coy W. Hendricks, a member of the Cass county bar for 41 years, who had long known deceased and formerly done some professional work for him, testified in part as follows:

"He was in my office three or four weeks before he

died as I recall.    I had drawn a will for Uncle Hiram, it was in my custody.    He said he came to get his will.    He said he thought he would make some deeds. As he left I told him I wouldn't destroy the will until I got the thing all fixed up.    He says, 'Well, will see you again.'    And that was the last time I saw him. He made no response as to whether he intended to hold the will until he made the deeds.    Before that I occasionally saw him on the streets, the last year of his life.    His eyesight was rather poor and he was crippled with rheumatism and carried a cane, although he got around.    I tried a case for him 30 years ago and he was an old man then.    He was quite a positive man.    Fairly intelligent.    I would judge that he had not been to school much and was not much of an educated man.    Quite a clear-headed man, quite a successful farmer."

Mrs. Eda McUmbre, a practical nurse with years of experience, was called to attend deceased after his last illness, which began with a cold and developed into an ominous case of pneumonia.    She had not previously known him.    When told who she was and introduced to him deceased spoke of knowing her brothers and talked about them.    She testified that he talked to her intelligently on various subjects from time to time, called her attention to some pears on the sideboard and named the party who brought them to him, and always talked rationally on whatever subject came up until the time of his death.    He once asked her whether she thought he was crazy and, on her replying she did not know why she should think so, "he said his daughter (Mrs. Moore) tried to make out he was crazy and wanted a guardian appointed several years ago," and spoke of her not coming to see him since he was sick.    At another time he remarked that he had his property fixed the way he wanted it, but did not tell her how.    He was perfectly able to rise from his bed without assistance and tend to the calls of nature right up to the time he died.    He seemed at all times to know what he was talking about and

she regarded his mental condition very good for a man of his age. Of the apparently sudden and fatal turn of his malady, she said: "I was in and talked to him just a few minutes before he began to sink. I went out of the room; when I came back I see he was sinking. He died a few minutes after that." This witness was not called to attend him until after November 20th, and no papers were signed by him while she was there. Of his mental condition in general as observed by her, she testified: "During the time that I was there up to ten minutes before he died, I would say that he was mentally competent to transact business."

After getting his will from the attorney with whom he had left it, deceased went with it to an old neighbor named Solon Straub whom he had named in his will as his executor, and showed it to him, told of some changes he wanted to make in the disposition of his property and consulted with him about deeding it instead of making another will. Straub replied that they sometimes broke deeds as well as wills and suggested he had better consult an attorney about it. Straub testified he had lived in Pokagon township 58 years and known deceased during all that time, meeting him frequently and that they always talked when they met, their last conversation about his will being in the fall not long before deceased's death, and said:

"He talked his business matters over with me some that day and seemed to be very clear in the matter. * * * I thought his mental condition was good, he seemed perfectly clear on business matters."

During the last few years of his life deceased lived a part of the time with his son, John, whose wife was the daughter of an old neighbor named Daniel Byrnes, who had lived all his life in Pokagon township and had been a justice of the peace for 47 continuous

years.    He made his home with John and his wife
on a farm occupied by them in which he had a life
interest.    Byrnes drafted the deed involved here and
other papers executed at the same time.    During the
summer before his death deceased lived alone on his
farm doing his own housework and boarding himself
part of the time, and part of the time taking his
meals at the home of his brother who lived near by.
He kept a horse and buggy which he drove to town
and elsewhere as business or inclination suggested.
That fall he went to live with his son, John.    The
household consisting of John and his wife, their son
and the two old gentlemen.    Near the middle of
November deceased contracted a cold which increased
in severity, until, on November 21st, a physician was
called who found pneumonia had developed and one
lung was partly consolidated.    The doctor visited him
but twice, the second time on Thursday, November
23d, when he said he found him "in a poor condition
and I was convinced it was his last illness."    He did
not visit him again as he learned he died that night
or early the next morning.

The deeds disposing of decedent's real estate were,
at his request, prepared by Byrnes during the previous
Sunday and Monday, and executed November 20th,
as the dates of the instruments show.    Deceased asked
Byrnes on the previous Saturday if he would draw
up some deeds for him and, on Byrnes consenting to
do so, told him in detail what he wanted.    Byrnes
obtained blank forms and started to draw up the
papers the following day in compliance with the
deceased's directions.    Though ill with a supposed
bad cold, the latter was up and dressed and had gone
out doors during that day.    He looked for and
found amongst his private papers a tax receipt of
his Allegan county farm of 140 acres for Byrnes to
get the description from, told him how he wanted

the deeds made, one to his son John of the home farm of 80 acres, one of 100 acres from his 140 acre farm in Allegan county to his daughter Edna and one of the remaining 40 acres to his daughter Ellura. He also had him draw up a contract by which John and Edna each agreed to pay deceased during his life annually $100, and on his death each to pay $125 for his funeral expenses. Byrnes testified that he merely drafted the papers as a conveyancer, deceased did not ask for any advice and he did not give him any, but he did ask Byrnes' charges for drawing up the papers and paid it when told the amount. After the papers were prepared Byrnes read them over to deceased, and he said they were all satisfactory, except he wished to have inserted after the name of his daughter Edna "and her heirs." An old neighbor named Witherell was called in as a witness. Deceased then signed the deeds in the presence of Witherell and Byrnes, as they both testify, and they signed as subscribing witnesses. Byrnes as justice of the peace took deceased's acknowledgment. Deceased told Byrnes not to deliver the deeds until he was released from a note to a Mr. Wadsworth on which he had gone security for Edna's husband. The next day the canceled note was brought to him. He took it and tore his name off, saying to Byrnes "deliver these other two deeds." On the morning of the day he died he asked for Byrnes and when the latter went into the sick room enjoined it upon him to "deliver Ellura her deed." These and other facts testified to of like import are only contradicted by indirect testimony to the effect deceased was not in physical or mental condition to say and do those things, and opinion testimony that his name as signed to the deeds is not his signature.

When hearing of the case was resumed on October 11th, and plaintiff had been permitted to amend her

bill by alleging the defense that the deeds were never signed by deceased, her counsel called in support of that allegation a witness from Detroit named Courtney who defined his calling as "a handwriting expert and examiner of disputed documents." In qualifying as an expert he spoke well of himself, said there were only about ten such experts in the United States, that on the only two occasions he had ever been confronted with experts he was not mistaken, but explained "when I say experts I am talking about experts and not about bank cashiers." With charts showing enlargements of what he termed "disputed" and "standard," or undisputed, signatures of deceased, and also the handwriting of Byrnes, he by explanations and comparisons demonstrated to an alleged verity the proposition that the disputed signature was written by Byrnes, and so gave his opinion as an expert that the disputed signatures to the deeds were not those of deceased. Though the defense did not have at command any of the only ten real experts in the United States, they produced on that issue two bank cashiers who qualified as experts from long years of experience in examining and comparing signatures, and testified that in their opinions the signatures in dispute were the genuine signatures of deceased. We have, as did the circuit judge, examined carefully the deeds, agreements, signatures, disputed and standard, made exhibits in the case, and the conflicting testimony of the experts which we are unable to find is overwhelmingly conclusive either way. Thrown into the balance of that issue is the positive testimony of the two subscribing witnesses, elderly men whose characters and reputations in that community are not otherwise questioned, one a magistrate for 47 consecutive years and the other an apparently disinterested neighbor incidentally asked in as a subscribing witness, who said he did not know "as it

was much of my business any way," but stated under oath that he looked over deceased's shoulder and saw him write it, and signed the papers as a witness. Added to this is the convincing evidence from the record taken in its entirety that the execution of those deeds for the disposition of his estate was deceased's independent conception, in harmony with what he planned to do and told others he was going to do. We are unable to disagree with the conclusions of the trial judge, who heard and saw all the thirty odd witnesses in the case, that plaintiff has failed to sustain by a preponderance of evidence any of the three grounds of invalidity launched against the conveyance in question.

The decree will stand affirmed, with costs to defendant.

MCDONALD, C. J., and BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred. CLARK, J., did not sit.